IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GUY SILEO, JR.,

              Petitioner,

   v.

GERALD L. ROZUM, et al.,

             Respondents.

CIVIL ACTION
NO. 12-3803

## OPINION

**Slomsky, J.**                                          **November 23, 2015**

## I.    INTRODUCTION

Before the Court are Objections to the Report and Recommendation of United States Magistrate Judge David R. Strawbridge recommending the denial of the Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 by Guy Sileo, Jr. ("Petitioner"). (Doc. No. 28.) Petitioner seeks relief based on violations of his Sixth Amendment right to effective assistance of counsel. (Id. at 2-3.)

Following a review of the filings by the parties and the pertinent record, the Magistrate Judge issued a Report recommending that the Petition for a Writ of Habeas Corpus be denied and that a certificate of appealability not be issued. (Doc. No. 27.) As noted, Petitioner has filed Objections to the Report and Recommendation. (Doc. No. 28.) For reasons that follow, the Court will adopt the Magistrate Judge's Report and Recommendation (hereinafter "the Report") and deny the Petition for a Writ of Habeas Corpus.[1]

---

[1] For purposes of this Opinion, the Court has considered the following: the Petition for a Writ of Habeas Corpus and Memorandum (Doc. No. 1), the Revised Petition with accompanying exhibits (Doc. No. 3), Respondents' Response in Opposition to the Writ of Habeas Corpus (Doc. No. 16), Petitioner's Motion to Amend his second claim (Doc. No. 17), Petitioner's

## II.     BACKGROUND

On August 1, 2001, after a five-day jury trial, Petitioner was convicted of first degree murder and possession of an instrument of crime.  Com. v. Sileo, 32 A.3d 753, 755 (Pa. Super. Ct. 2011).

The Magistrate Judge reproduced the Superior Court's detailed account of the evidence adduced at the trial.   The following recitation of the facts is taken from the Report and incorporates corrections made by the Magistrate Judge in bracketed italics:[2]

> [Petitioner] and Jim Webb were business partners operating a restaurant known as General Wayne Inn (the "Inn") in Lower Merion, Pennsylvania. The Inn was incorporated, and [Petitioner] and Mr. Webb each owned fifty percent of its stock. On December 27, 1996, Mr. Webb was found dead in his office located on the third floor of the restaurant. He was killed between 7:00 p.m. and midnight on December 26, 1996, by a single gunshot to the back of the head inflicted by a .25 caliber Winchester bullet. At the time of the murder, the Inn was in critical financial shape. Mr. Webb's life was insured to the benefit of the business and [Petitioner], but Mr. Webb had stated his intent to terminate his business relationship with [Petitioner] and start his own restaurant.
>
> . . .
>
> Dr. Halbert Fillinger performed the autopsy and concluded that Mr. Webb died of a single bullet that entered the rear of his head while he was standing. The bullet stopped in the forehead, and there was no exit wound. Jim Webb died between 7:00 p.m. and midnight on December 26, 1996.
>
> The following evidence pertaining to motive was introduced. The Inn was purchased on November 17, 1995, for $1,286,000, of which $1,140,000 was financed. Mr. Webb was the executive chef at the restaurant while [Petitioner] was the *sous* chef, handling side dishes and appetizers. At the time of the Inn's purchase, life insurance on Jim Webb's life in the amount of $650,000 was

---

Reply to the Response (Doc. No. 18), the Magistrate Judge's Report and Recommendation (Doc. No. 27), Petitioner's Objections to the Report and Recommendation (Doc. No. 28), Respondents' Response in Opposition to Petitioner's Objections (Doc. No. 34), the transcript of the hearing held on April 29, 2015 (Doc. No. 39), Respondents' Post-Argument Brief in Opposition to Petitioner's Objections (Doc. No. 42), Petitioner's Reply to Respondents' Post-Argument Brief (Doc. No. 43), and the relevant state court record.

[2] The Magistrate Judge corrected in italics errors made by the Superior Court.  This Court agrees with the Magistrate Judge's corrections and therefore includes them here.

obtained for [Petitioner's] benefit and *vice versa*. After Mr. Webb died, $433,303 of the life insurance proceeds went to satisfy a loan owed by the Inn to the Small Business Association, and the remaining funds went into escrow in connection with bankruptcy proceedings for the Inn filed after Mr. Webb's death.

The Commonwealth presented Richard Zayas as an expert in the area of forensic accounting. Mr. Zayas reviewed the financial condition of the Inn, a corporation equally owned by [Petitioner] and Mr. Webb, and he established the following. The restaurant opened in December 1995, was not profitable, and would not have been able to continue to operate through 1997. There were three loans secured by restaurant assets, sales were decreasing, and it was unlikely that the Inn would have received the cash infusion critical to its survival. Mr. Zayas opined that the Inn was insolvent at the time of the murder.

[Petitioner's] father, Guy Sileo, had contributed $100,000 in connection with the purchase of the Inn. In a letter to one of the Inn's creditors, Mr. Sileo represented that the $100,000 was a gift. As the Inn began to fail and Mr. Webb articulated his desire to open another restaurant without [Petitioner], [Petitioner] began to insistently demand that Mr. Webb and his wife sign a document acknowledging that the $100,000 from [Petitioner's] father was a loan rather than a gift. The Webbs refused to sign that document. After the murder, [Petitioner], in his capacity as owner of the Inn, entered a stipulation that the $100,000 from his father was a loan rather than a gift. After this stipulation was entered, [Petitioner's] father became a creditor of the corporation and thus, eligible to receive part of the $215,000 in life insurance proceeds that were paid into the bankruptcy proceeding.

By December 1996, Mr. Webb began to act on his plan to leave the Inn and start his own restaurant. Mr. Webb was dissatisfied with [Petitioner's] performance, believed that [Petitioner] drank excessively, and was upset about [Petitioner's] extramarital affairs. John L., who sold advertising for the Inn, said that Mr. Webb told him that "he was going to terminate the relationship [with Petitioner] and leave the restaurant after New Year's." N.T. Trial, 7/26/01, at 122. John L. opined that Mr. Webb would have been successful in that endeavor because his "talent was renown. He had an innate talent." *Id.* at 125.

Robin Webb, Mr. Webb's wife, confirmed that at the time of the murder, [Petitioner] and her husband were "not getting along." *Id.* at 141. Every month, the Inn was getting deeper in debt while [Petitioner] was drinking, openly engaged in an extramarital affair with Inn-employee Felicia M., and was not performing his duties with respect to the restaurant. In the weeks leading up to the murder, [Petitioner] and the victim were "[a]rguing, shouting. Sometimes it was physical. Sometimes there [were] days that they wouldn't speak to each other." *Id.* at 142.

3

On November 9, 1996, [Petitioner] and Mr. Webb got into a fistfight in an office on the third floor of the restaurant, and Mrs. Webb managed to stop the altercation. After the fight ceased, Mr. Webb left the office momentarily and, when he returned, Mr. Webb was upset and distressed. He told his wife, "[Petitioner's] got that gun, the unregistered one." *Id.* at 155. After the fistfight, Mr. Webb started taking steps to dissolve the business.

On December 19, 1996, Mr. Webb visited the Inn's corporate attorney, William W. William W. confirmed that Mr. Webb was very upset and told William W. that he needed "to get out of the business. I want out of the General Wayne." *Id.* at 214. Mr. Webb explained to William W. that he was working too hard and that [Petitioner] was "not pulling his weight. [Petitioner] is drinking too much. And [Petitioner] is having a relationship with one employee." *Id.*

We now examine the evidence relating to the events that occurred during and after the discovery of Mr. Webb's body. The Inn consisted of three floors, and the victim was found in his third-floor office. Betty C., the pastry chef, arrived for work at the Inn at 7:50 a.m. on December 27, 1996. Mr. Webb's truck was located in the parking lot, and the Inn's front door was unlocked. Betty C. called for the victim, received no reply, and started to bake. [Petitioner] arrived at approximately 9:20 a.m., appeared upset, and informed Betty C. that he and his wife were separating.

After Betty C. told [Petitioner] that she had not been able to locate Mr. Webb, [Petitioner] went upstairs, and he returned, saying, "Jim is dead on the office floor upstairs. We have to call police." N.T. Trial, 7/25/01, at 72. [Petitioner] then said, referring to the people purportedly responsible for the death, "[T]hose dirty bastards," and "[T]hose lousy bastards." *Id.*

Betty C. went to the third floor. The victim was lying on his back on the carpet next to his desk. He had no visible wounds, and there was dried blood in his nose and coming from his mouth. Betty C. testified that Mr. Webb appeared to have died by falling and hitting his head. She related, "I did not see any wound, any reasons that something else had killed him." *Id.* at 85. Betty C. also told the jury that she twice heard [Petitioner], who openly owned a gun, say, "I really feel like I need to shoot someone." *Id.* at 90-91.

Betty C. continued that Mr. Webb was the executive chef of the Inn and the driving force behind its operation. She also confirmed that Mr. Webb was "very concerned about the amount of drinking that [Petitioner] was doing. [The victim] felt because of it, [Petitioner] was not able to work as much as he could and was not holding up his end of the whole deal that they had made with running the restaurant." *Id.* at 87. Finally, Betty C. stated that the decedent also was upset about [Petitioner's] relationship with Felicia M. Mr. Webb was afraid that if something happened in the relationship, Felicia M. would file a sexual harassment

4

lawsuit against the restaurant. Mr. Webb told Betty C. that if something happened with the Inn, he would start another restaurant without [Petitioner].

Lower Merion Township Police Officer Thomas Bowman, together with trainee Police Officer Christopher Arriviello, responded to the call about an unresponsive person at the Inn, and they arrived at approximately 9:35 a.m. on December 27, 1996. Officer Bowman was the first police officer to inspect the body. Like Betty C., Officer Bowman saw no evidence of wounds or indication that Mr. Webb had been shot. Officer Bowman did see an injury to Mr. Webb's forehead, and as did Betty C., he believed that the victim died after falling and hitting his head. He left the body in place and called his sergeant.

Officer Arriviello related that when he arrived at the Inn at 9:35 a.m., he spoke with [Petitioner], who informed Officer Arriviello that his partner was dead. When Officer Arriviello asked what had occurred, [Petitioner] responded, "He was killed.... For the money, the money.... It must have been for the money." *Id.* at 143.

Lower Merion Detective Sergeant John Stillwagon arrived at the Inn around 10:00 a.m. After he viewed Mr. Webb's body, he came to the same conclusion about the manner of death as Betty C. and Officer Bowman. There was no reason to conclude that the victim had been killed. Sergeant Stillwagon saw a lump on the victim's forehead, which indicated to him that Mr. Webb hit his head on a counter next to the body and died as a result of a fall.

After Sergeant Stillwagon viewed the murder scene, he went downstairs and asked [Petitioner] when he last saw Mr. Webb alive. [Petitioner] responded that he saw the decedent alive at 10:00 p.m. on December 26, 1996. [Petitioner] related that at that time, he and Felicia M. left the Inn with Jim Webb inside. [Petitioner] and Felicia M., who died in February 1997, were the last people to see Mr. Webb alive.

After [Petitioner] admitted to Officer Arriviello that he was aware that Mr. Webb had been murdered, police discovered that this information was true. Specifically, a bullet wound was discovered in the back of the decedent's head. At that time, there were six police officers present in the room. All six police officers decided to keep confidential the fact that Mr. Webb had been shot.

Thus, when Mr. Webb's family arrived at the Inn after 10:00 a.m. on December 27, 1996, no one had viewed the bullet wound other than the six police officers sworn to secrecy. Sergeant Stillwagon went to tell the family about his death. At that time, [Petitioner] approached Mrs. Webb, and [Petitioner] said, "Jim's been shot." *Id.* at 171. Sergeant Stillwagon was "surprised at the statement wondering how [Petitioner] knew that" Mr. Webb had been shot. *Id.* Sergeant Stillwagon emphasized that the six police officers who were in the room when the bullet hole was discovered "consciously kept that information to the people that were in the

room." *Id.* at 172. After [Petitioner] made this statement to Mrs. Webb, Sergeant Stillwagon specifically ascertained from the other five police officers who were present when the wound was found that they had not told [Petitioner] that Mr. Webb was shot.

Lower Merion Police Detective George Metz accompanied Sergeant Stillwagon to inform Mr. Webb's family about the death. He also heard [Petitioner] tell Robin Webb that "Jim had been shot." *Id.* at 210. Detective Metz became suspicious since at that time, only police were aware of that fact. The bullet's entry wound was to the back of the head, the victim was lying on his back, there was no blood on the floor, and police in the room at the time of its discovery agreed not to disclose that information to anyone.

Lower Merion Police Detective Michael Gilbert established the following. No wine was reported missing from the restaurant. The safe was locked, inventoried, and contained $7,106.22 in cash. The victim was wearing a watch and a gold chain, and his wallet, which contained $515 in cash, was in his pants pocket. Police recovered a .25 caliber Winchester bullet casing, which is also known as a cartridge, in the office with the body. Sergeant Stillwagon established that there was no evidence of a forced entry at the Inn and confirmed that there was no indication that anything had been taken from the establishment.

Lower Merion Police Detective Timothy Woodward was involved in the investigation into Mr. Webb's death. Detective Metz informed Detective Woodward that [Petitioner] told Mrs. Webb that her husband had been shot so Detective Woodward confirmed with all six police officers who were present when the bullet hole was discovered that they had not told anyone about it.

Detective Woodward interviewed [Petitioner] on December 27, 1996. [Petitioner] reported to Detective Woodward that the following occurred. He and his girlfriend, Felicia M., left Jim Webb alone at the Inn at 10:00 p.m. on December 26, 1996. Felicia M. had car trouble, and after [Petitioner] restarted her car, Felicia M. drove away and went to her girlfriend's house. After [Petitioner] started Felicia M.'s car, he re-entered his car and went to a local establishment called Mulligan's Bar. After drinking there, [Petitioner] went home and then called Felicia M. from his car and told her that he was going to leave his wife and asked Felicia M. to wish him luck. Police obtained copies of [Petitioner's] cell phone records, which established that the call to Felicia M. was placed at 11:29 p.m. on December 26, 1996.

Commonwealth witness Michelle P. indicated that she went to dinner with Felicia M., [Petitioner], and another employee of the Inn on December 27, 1996, the day following the murder. During dinner, [Petitioner] told his companions that police thought that Mr. Webb died in a robbery and that expensive wine was missing from the restaurant.

Extensive evidence was presented as to [Petitioner's] ownership of the unregistered gun mentioned by Jim Webb after the fistfight as well as [Petitioner's] unsuccessful attempt to hide his ownership of that weapon from police. Police executed a warrant at [Petitioner's] home on December 28, 1996, and recovered a .38 caliber Taurus pistol and a .25 caliber Phoenix Arms semi-automatic pistol, which was not the murder weapon, in a Galco holster. [Petitioner] purchased the .25 Phoenix Arms handgun on December 2, 1996, just weeks prior to the murder. Detective Woodward interviewed [Petitioner] again on December 31, 1996, when [Petitioner] affirmatively represented to Detective Woodward that the .25 caliber Phoenix Arms was the only .25 caliber weapon that he had ever owned.

[Petitioner] was called to testify in front of the grand jury convened to investigate Mr. Webb's death and was asked whether he had ever possessed a .25 caliber pistol other than the Phoenix Arms pistol that police seized from his home. He answered that question negatively. In an April 1997 consensual wiretap performed by police, [Petitioner] admitted to a former employee that he had owned a different .25 caliber weapon. [Petitioner] was charged with and convicted of perjury in connection with his statement before the investigating grand jury.

Commonwealth witness Joseph C. knew [Petitioner] and the victim when they owned a restaurant called American Bistro Inn. Two weeks before the Inn opened, [Petitioner] showed Joseph C. a .25 caliber handgun that [Petitioner] owned. Joseph C. saw markings on that weapon that indicated that it was made in Gardo, Italy, by a manufacturer whose name started with the letter B. The witness testified that Beretta makes guns in Gardo, Italy.

Michelle P. also provided evidence on the subject. She said that in November 1996, [Petitioner] and Felicia M. became lovers, and they used Michelle P.'s apartment for trysts. Michelle P. observed [Petitioner] in possession of two guns at her apartment on November 16, 1996. She testified that one was in a holster on [Petitioner's] body and that there was another, smaller gun.

In December 1996, Christopher S. was the bartender at Mulligan's Bar, which he referred to as Mulligan's Grill. He was well acquainted with [Petitioner], Felicia M., and Mr. Webb because they frequented the bar. At the end of October 1996, [Petitioner] was at the bar when he informed Christopher S. that he had two weapons, a large gun in a shoulder holster and a smaller .25 caliber weapon that he kept in the back of the holster. Christopher S. also established that sometime in November 1996, [Petitioner] was speaking with Christopher S. about extradition and said, "Chris, do you know of countries that we don't have any extradition treaties with, like if you wanted to—where—somewhere you could hide-out if you wanted to kill somebody." N.T. Trial, 7/27/01, at 6.

7

The Commonwealth presented a significant amount of evidence [*supporting the inference*] that bullets found in [Petitioner's] .25 caliber Phoenix Arms handgun came from a partially-filled box of ammunition discovered in a room next to Jim Webb's body and that the bullet used to kill Mr. Webb was from that same box. Montgomery County Detective Leon Krebbs was certified as an expert in firearms and tool mark identification, and he established the following. Each type of gun produces different marks on a bullet as the bullet passes through the barrel of the gun. The bullet removed from Jim Webb's skull was a Winchester brand bullet, caliber .25 automatic, and in very good condition. It was not fired from the Phoenix Arms handgun recovered from [Petitioner's] home but could have been fired from a Beretta .25 caliber handgun. Police recovered bullets from [Petitioner's] Phoenix Arms weapon and also discovered a partially-filled box of bullets in the room next to Mr. Webb's body. The bullet that killed the victim, the bullets in [Petitioner's] Phoenix Arms handgun, and the bullets remaining in the box recovered in the room at the Inn were "Winchester brand, caliber .25 automatic. All of [the bullets] had full metal jacket, meaning that the bullet was completely encased in copper, with the exception of the base." N.T. Trial, 7/27/01, at 113.

Special Agent Paul Tangren of the Federal Bureau of Investigation was also qualified as an expert in firearms and tool mark examination. Through other witnesses, the Commonwealth had established that [Petitioner's] Phoenix Arms weapon was stored in a Galco holster, which also was seized by police. Agent Tangren established the following. A bullet is manufactured in a cartridge, which is a casing around the bullet. The cartridge has a base, where the bullet is struck when it is fired. After being struck, the bullet is the projectile that is propelled through the gun barrel, and in a semi-automatic gun, the cartridge is ejected from the gun after the bullet is fired. When a bullet is manufactured, a headstamp is placed on the base of the cartridge by a tool called a bunter. Bunters wear out, and each one has unique, microscopic flaws that produce slight discrepancies. These flaws render it possible to ascertain if a bullet's headstamp was produced by the same bunter as another bullet.

Agent Tangren analyzed the cartridges from the partially-full box of Winchester bullets from the Inn, the cartridges taken from [Petitioner's] Phoenix Arms gun, and the cartridge found in the room when Mr. Webb's body was discovered. All the cartridges that he examined had Winchester headstamps, and the identical bunter produced [*headstamps found on one bullet sample taken from the Phoenix Arms gun, on one bullet sample taken from the box at the Inn, and on the spent casing found in the room where Webb's body was discovered*].

Agent Tangren also analyzed the holster holding the Phoenix Arms gun. When a gun is placed in a holster, it leaves marks, impressions, and abrasions inside the holster. The holster from [Petitioner's] house had tool marks consistent with the Phoenix Arms gun located inside it as well as tool marks inconsistent with that weapon but consistent with a .25 caliber Beretta pistol having been placed therein.

8

The markings on the holster indicated that there was prolonged or repeated contact between the holster and the Beretta.

The Commonwealth also produced expert Charles Peter[s], who worked for the FBI. He conducted comparative bullet lead analyses on the bullets found in [Petitioner's] Phoenix Arms gun, bullets in the ammunition box found in the room next to Mr. Webb's office, and the bullet that killed the victim. Mr. Peter[s] related that bullet lead is produced in a kettle and that every kettle of lead, which consists of about one ton, has its own distinct composition of metals. The chemical composition of [*several of*] the bullets he examined were indistinguishable[*: the fatal bullet matched the composition of 3 of the 24 bullets analyzed from the box in the Inn, and the bullet in the cartridge found across the street from the Inn matched the composition of other bullets from the box and bullets found in the Phoenix Arms gun*].

Finally, the following Commonwealth evidence was presented as to [Petitioner's] whereabouts on the night of the murder. As noted, [Petitioner] told police that he left the Inn at 10:00 p.m. with Felicia M. and went to Mulligan's Bar while Felicia M. first went to a friend's house and then rendezvoused with him at the bar later. Michelle P. provided testimony relevant to [Petitioner's] alibi. She stated that on December 26, 1996, she arrived at her home between 10:00 p.m. and 10:15 p.m., and Felicia M. was present and using the bathroom. Michelle P. said that it took fifteen minutes to reach her home from the Inn.

Christopher S., the bartender at Mulligan's Bar on the night in question, specifically recalled that [Petitioner] entered the establishment on the night of December 26, 1996, sometime between 10:30 p.m. and 10:45 p.m. Christopher S. was able to offer this evidence because he looked at a clock when [Petitioner] arrived that evening. N.T. Trial, 7/26/01, at 8. [Petitioner] appeared "harried, nervous and sweaty." *Id.* [Petitioner] told Christopher S. that he was leaving his wife for Felicia M., who arrived twenty to thirty minutes after [Petitioner]. Christopher S. related that Felicia M. and [Petitioner] left Mulligan's Bar after 11:00 p.m.

[Petitioner's] testimony, which the prior PCRA panel construed as an alibi, was as follows. The restaurant closed at 8:30 p.m. and at around 9:30 p.m., Felicia M. took some employees to the bus stop in [Petitioner's] Jeep and returned to the Inn. When Felicia M. returned, she, [Petitioner], and Jim Webb were the only people remaining at the Inn. They agreed to meet at Mulligan's Bar. The victim stayed behind to do some work, locked the door with [Petitioner's] keys, and returned those keys to [Petitioner]. [Petitioner] and Felicia M. left the Inn at 10:00 p.m.

[Petitioner] drove Felicia M. to her car, which took one or two minutes. Felicia M. started to drive to a nearby bank, but her car stalled and she coasted into a parking lot located directly across the street from the Inn. [Petitioner] had followed Felicia M. and looked down the street to see if a nearby gas station was open but the

lights were extinguished. [Petitioner] restarted Felicia M.'s car himself. [Petitioner] said that the car stalled about five minutes after they left the Inn, and he started the car about one minute later. [Petitioner] told the jury that it took eighteen minutes to reach Mulligan's Bar from the Inn and he arrived there at 10:20 or 10:25p.m., at the latest.

We now compare [Petitioner's] timeframe with that established by Michelle P. and Christopher S., who were disinterested witnesses. Michelle P.'s testimony was that on December 26, 1996, she arrived at her home between 10:00 p.m. and 10:15 p.m., and Felicia M. was already present and using the bathroom. Michelle P. said that it took fifteen minutes to reach her home from the Inn so, according to Michelle P.'s testimony, Felicia M. must have left the parking lot located across the street from the Inn by 10:00 p.m. at the latest because she was already present and using Michelle P.'s bathroom when Michelle P. arrived home by 10:15 p.m., which was the latest possible time that Michelle P. came home. Then, Christopher S., the bartender at Mulligan's Bar, testified specifically that [Petitioner] did not arrive at that establishment until after 10:30 p.m. Christopher S. stated that he remembered "checking out a clock" when [Petitioner] came into Mulligan's Bar on December 26, 1996, and that [Petitioner] arrived "[s]ometime after 10:30" p.m., between 10:30 and 10:45 p.m. N.T. Trial, 7/27/01, at 8. He said that it was probably 10:35 p.m.

Thus, Michelle P. established that Felicia M. drove away, leaving [Petitioner] alone across the street from the Inn sometime between 9:45 p.m. and 10:00 p.m. Meanwhile, Christopher S. proved that [Petitioner] did not arrive at Mulligan's Bar until after 10:30 p.m. [Petitioner] said that it was an eighteen-minute drive to Mulligan's Bar from the Inn. Thus, these two completely independent witnesses directly refuted [Petitioner's] timeline and established that [Petitioner] was alone at the Inn by 10:00 p.m. at the latest and did not leave until 10:17 p.m. [Petitioner] had a gun and the keys to the Inn in his possession and was across the street from the murder scene. [Petitioner] had between seventeen minutes and thirty-two minutes alone at the crime scene.

Felicia M. gave police two statement[s], which have been characterized as supporting [Petitioner's] alibi evidence. In a December 27, 1996 statement taken by Sergeant Stillwagon and Detective Metz, Felicia M. said she and [Appellant] left the Inn at "[a]pproximately, 10:00 o'clock" and planned to go to Mulligan's Bar with Mr. Webb, who said that he would arrive shortly. N.T. Trial, 7/26/01, at 248. Felicia M. told police that after she left the Inn, "I had trouble with my car. And when I got it started, we drove to Mulligan's. I drove in my car and [Petitioner] in his jeep." *Id.* at 249. Felicia M. reported that she and [Petitioner] stayed at Mulligan's Bar until 11:30 p.m. or 12:00 a.m., when [Petitioner] left after informing her that he was going home to tell his wife he was separating from her.

10

Lower Merion Detective Charles J. Craig, Jr. took a statement from Felicia M. on December 28, 1996. In this statement, Felicia M. stated that the following occurred on the evening of December 26, 1996. Business was slow and the restaurant closed at 8:30 p.m. Three other employees and Felicia M. cleaned the establishment, finishing "around 9:30 p.m. or so." *Id.* at 251. [Petitioner] took the cash drawer to the office, one employee left, and Felicia M. took the other two employees to the bus stop in [Petitioner's] Jeep. When she returned, [Petitioner] and Mr. Webb were at the bar.

Felicia M. continued that after arranging to meet Mr. Webb at Mulligan's Bar, she and [Petitioner] then entered his Jeep and drove to a parking lot close to the restaurant, where Felicia M.'s car was located. She entered her car and tried to drive to a bank near the Inn, when her car stalled. [Petitioner] was following her, went to the gas station down the street to see if it was open, and then returned. He started her car, and Felicia M. decided not to use the bank and drove away while [Petitioner] remained behind near to the Inn in his Jeep.

However, in the December 28, 1996 statement, Felicia M. did not say that she went to Mulligan's Bar after leaving the Inn. Rather, Felicia M. indicated that she went to Michelle P.'s home before going to Mulligan's Bar. On December 28, 1996, Felicia M. did not tell police that she stayed at the bar between one hour and one and one-half hours. Instead, she said that she was there for one-half hour and went home. While the first statement made no mention of a telephone call, in the second one, Felicia M. said that after she was home, [Petitioner] called from his cell phone and told her that he was going into his house and to wish him luck.

(Doc. No. 27 at 2-5, 27-35 (quoting Com. v. Sileo, 32 A.3d 753, 755-57, 759-66 (Pa. Super. Ct.

2011)) (footnotes omitted).)

The Superior Court also provided a thorough explanation of the procedural posture of the

case:

[After the murder, Petitioner] was interviewed by police and admitted that he owned a .25 caliber Phoenix Arms handgun, which police recovered. Testing on the .25 caliber Phoenix Arms gun revealed that it was not the murder weapon. [On January 2, 1997] [Petitioner] was called to testify before a grand jury investigating Jim Webb's murder and represented that the .25 caliber Phoenix Arms gun was the only .25 caliber weapon that he had ever owned. Subsequently, one of [Petitioner]'s former employees agreed to a consensual wiretap, and [in April 1997] the employee recorded a conversation with [Petitioner] wherein [Petitioner] stated that he had owned a different .25 caliber handgun. [Petitioner] was charged with and [on October 21, 1998] found guilty by a jury of perjury and false swearing, and we affirmed the judgment of sentence on appeal. *Commonwealth v. Sileo*, 750 A.2d 375 (Pa. Super. 1999) (unpublished memorandum), *appeal denied*, 568 Pa. 660, 795 A.2d 974 (2000).

11

Following affirmance of his perjury conviction, on October 24, 2000, [Petitioner] was charged with homicide and possession of an instrument of crime ("PIC") in connection with Mr. Webb's death. The case proceeded to a jury trial where [Petitioner] testified that at 10:00 p.m. on December 26, 1996, he left the Inn, where Mr. Webb was alone and alive, and went to a local bar to drink. On August 1, 2001, a jury found [Petitioner] guilty of first degree murder and PIC.[3] Trial counsel, Richard Winters, Esquire, withdrew, and Howard Bashman, Esquire, represented [Petitioner] at sentencing. Mr. Bashman then filed a post-sentence motion raising eight allegations of trial counsel's ineffectiveness. A hearing on those claims was held and on direct appeal, where [Petitioner] remained represented by Mr. Bashman, we affirmed. *Commonwealth v. Sileo*, 837 A.2d 1181 (Pa. Super. 2003).

In that direct appeal, [Petitioner] raise[d] a claim of ineffectiveness of trial counsel as well as preserved issues of trial court error. We ruled that [Petitioner]'s ineffectiveness arguments were subject to direct review under the exception to *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), created in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), and we affirmed. Our Supreme Court denied further review. *Commonwealth v. Sileo*, 578 Pa. 708, 853 A.2d 361 (2004).

[Petitioner] filed a timely pro se PCRA petition, and then retained Jules Epstein, Esquire, who filed a counseled petition on June 6, 2003. PCRA counsel raised numerous claims of ineffective assistance of counsel, including that trial counsel rendered ineffective assistance when he failed to request an alibi instruction. The PCRA court conducted an evidentiary hearing but confined the parameters of that hearing and did not permit the presentation of evidence as to [Petitioner]'s position that trial counsel improperly failed to ask for an alibi instruction. The PCRA court concluded that trial counsel was not ineffective in that respect because an alibi instruction was not warranted under the evidence presented at trial. After the hearing, the PCRA court denied relief.

On appeal, a three-judge panel affirmed the PCRA court's decision to deny relief with a single exception: it concluded that [Petitioner]'s testimony established the existence of an alibi and thus was sufficient to support an alibi instruction. *Commonwealth v. Sileo*, 953 A.2d 606 (Pa. Super. 2008) (Bowes, J., dissenting) ("prior PCRA panel"). The prior PCRA panel therefore remanded the "case for further proceedings to determine the reasonableness of trial counsel's decision in this regard." Superior Court Memorandum, 3/25/08, at 26. In summarizing its disposition of the PCRA appeal, the prior PCRA panel indicated that it affirmed all the rulings of the PCRA court but was remanding "the case for an evidentiary hearing limited to the strategic basis underlying the decision of trial counsel not to

---

[3] Petitioner was sentenced to life in prison without the possibility of parole.  (Doc. No. 28 at 1.)

request an alibi instruction, as well as post-trial counsel's decision not to raise that issue." *Id.*

On remand, the PCRA court conducted the requisite hearing, where trial counsel indicated that he did not request an alibi instruction because he did not believe that [Petitioner]'s testimony constituted an alibi but instead, was a general denial of guilt. Appellate counsel stated, similarly, that he did not litigate the issue of trial counsel's ineffectiveness for not requesting for an alibi instruction since he did not believe that [Petitioner]'s testimony established an alibi.

Since the prior PCRA panel determined that the underlying issue had merit in that [Petitioner]'s testimony did establish an alibi and, since trial and appellate counsel had not articulated a reasonable basis for their decisions, the PCRA court addressed the third prong of the test applicable to analyzing ineffectiveness of counsel. Specifically, the PCRA court considered whether [Petitioner] was prejudiced by trial counsel's failure to request an alibi instruction. Concluding that there was no prejudice, the PCRA court again denied relief.

(Doc. No. 27 at 2-5 (quoting Sileo, 32 A.3d at 755-57).)

On July 5, 2012, Petitioner brought the instant habeas litigation by filing a counseled petition and memorandum of law. [4]   (Doc. No. 1).  Petitioner sought habeas relief on two of the ineffectiveness grounds litigated on PCRA review: the failure of counsel to (1) seek an alibi jury instruction and (2) object to comments by the prosecutor that allegedly infringed on his constitutional rights.  (Id. at 3-4.)  He filed a Revised Petition on August 2, 2012.  (Doc. No. 3.) On August 13, 2012, this Court referred the case to Magistrate Judge David R. Strawbridge for a Report and Recommendation.  (Doc. No. 4.)  On December 7, 2012, the District Attorney of Montgomery County filed a response to the Petition.  (Doc. No. 16.)  Petitioner amended his second claim on December 10, 2012 (Doc. No. 17) and filed a reply to Respondent's Response on December 17, 2012 (Doc. No. 18).  Magistrate Judge Strawbridge issued a Report and Recommendation on September 22, 2014 (Doc. No. 27), and Petitioner filed Objections to the Report on October 2, 2014 (Doc. No. 28).  On March 3, 2015, Respondents filed a Response in

---

[4] Petitioner remains represented by Jules Epstein, Esquire.

Opposition to Petitioner's Objections (Doc. No. 34), and on April 29, 2015, the Court held a hearing on the Objections (Doc. No. 37).   Respondents filed a Post-Argument Brief in Opposition to Petitioner's Objections on July 6, 2015 (Doc. No. 42), and Petitioner filed a Reply on July 9, 2015 (Doc. No. 43).

Petitioner's Objections are now before the Court for review.

## III.   STANDARD OF REVIEW

### A.  28 U.S.C. § 2254 Review

Pursuant to 28 U.S.C. § 2254(d), federal habeas relief is precluded on:

> any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This is a deferential standard of review.  When the state court has not adjudicated a petitioner's claims on the merits, however, the federal court conducts de novo review.  Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010); see also Coombs v. Diguglielmo, 616 F.3d 255, 261 (3d Cir. 2010) (reviewing petitioner's claim de novo since state courts did not review it on the merits).  Regardless of whether a petitioner's claims were adjudicated on the merits, factual determinations made by a state court are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also Palmer, 592 F.3d at 392 (quoting Simmons v. Beard, 581 F.3d 158, 165 (3d Cir. 2009)).

### B.  De Novo Review of Objections to the Report and Recommendation

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on petitions for post-conviction relief.  Any party may file objections in response to the magistrate

14

judge's Report and Recommendation.  Id. at § 636(b)(1)(C).  Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The [district] judge may also receive further evidence or recommit the matter to the magistrate judge with further instructions."  Id.  "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court."  Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987); see also 28 U.S.C. § 636(b).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's Report and Recommendation.  Under that rule, Petitioner must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections[.]"  Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012).  Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C).  De novo review is non-deferential and generally permits the district court to conduct an "independent review" of the entire matter.  Salve Regina College v. Russell, 499 U.S. 225, 238 (1991).  "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper."  Owens v. Beard, 829 F.Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

## IV.   ANALYSIS

In his Petition for a Writ of Habeas Corpus, Petitioner raised two claims for relief.  The Magistrate Judge reviewed the claims in his Report and Recommendation, and this Court will now review Petitioner's Objections to the Report.  Because Petitioner challenges his conviction

on the grounds of ineffective assistance of counsel, the Court will briefly describe the standard for claims of ineffective assistance of counsel.  It will then summarize the Magistrate Judge's analysis of the two grounds upon which Petitioner seeks habeas relief.  Finally, the Court will address each of Petitioner's six Objections.

### A.  **Strickland** **Prejudice Standard**

Pursuant to the Sixth Amendment of the United States Constitution, every accused individual has a right to representation that meets "an objective standard of reasonableness." U.S. Const. amend. VI; Strickland v. Washington, 466 U.S. 668, 688 (1984).  To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate the following: (1) counsel's representation was objectively unreasonable; and (2) but for counsel's deficient representation, there is a reasonable probability that the result of the proceeding would have been different.  Strickland, 466 U.S. at 668.  In considering Petitioner's ineffective assistance claim, the Superior Court quoted the Pennsylvania standard that a defendant must meet to obtain a new trial based on ineffective assistance of counsel: "In our Commonwealth, we have rearticulated the Strickland Court's performance and prejudice inquiry as a three-prong test.  Specifically, a petitioner must show: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or inaction; and (3) counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error."  Com. v. Sileo, 32 A.3d 753, 757 (Pa. Super. Ct. 2011) (quoting Com. v. Dennis, 17 A.3d 297, 301 (2011)).

### B.  Magistrate Judge Strawbridge's Report and Recommendation[5]

Petitioner raised two claims for relief in his Petition for a Writ of Habeas Corpus.  First, he challenged his conviction based on ineffective assistance of counsel relating to the presentation of an alibi defense.  Second, he challenged his conviction based on counsel's failure to object to suggestions by the prosecutor that his silence was evidence of guilt as well as to his failure to object to the prosecutor's comment upon Petitioner's assertion of innocence in the perjury case.

Magistrate Judge Strawbridge issued a detailed 69-page Report and Recommendation in which he concluded on the first claim that, even if Petitioner's counsel's assistance was considered deficient as to the alibi defense, Petitioner was not sufficiently prejudiced to warrant habeas relief.  The Magistrate Judge also concluded that the state court's rejection of Petitioner's second claim was not unreasonable.

In his first claim (hereinafter "Claim One"), Petitioner contended that counsel had presented evidence at trial that suggested an alibi defense but then failed to request an alibi jury charge available under state law.  Such a charge would make clear to the jury that the presentation of an alibi does not impose a burden of proof on the defense.  Petitioner presented three arguments in favor of de novo review based on the state court's allegedly erroneous rejection of this claim on PCRA review.  Upon review of the state court adjudication, the Magistrate Judge concluded, however, that the record did include errors that warranted de novo review of Petitioner's first ineffective assistance claim.  After a thorough analysis of the record, the Magistrate Judge determined that, even if de novo federal review applied here, the alleged deficient performance by counsel failed to meet the Strickland prejudice requirement.  Thus,

---

[5] The Court will analyze the Report in greater detail below in its review of the Objections.

Petitioner had failed to establish a violation of his Sixth Amendment right to counsel.  As the Magistrate Judge stated, "when we consider the closing arguments of counsel in context, the jury charge, and the totality of the evidence presented, we do not believe that there was any reasonable likelihood of a different result had counsel requested an alibi instruction.  We do not find a reasonable probability that the alibi instruction would have been the 'tipping point' for the jury to acquit Sileo."  (Doc. No. 27 at 42-43.)

Petitioner's second claim ("Claim Two") challenged his conviction based on counsel's failure to object to the prosecutor's references to his silence and to his assertion of innocence in the perjury case.  He claimed that the prosecutor used evidence of Petitioner's failure to volunteer information about his gun ownership as substantive evidence of guilt.  He also alleged that the prosecutor's comparison of his not guilty plea in the perjury case to his not guilty plea in the murder case deprived him of a presumption of innocence by "impermissibly reduc[ing] the prosecution's burden of proof."  (Doc. No. 27 at 45-46 (quoting Doc. No. 1 at 20-21).)  The Magistrate Judge reviewed the alleged violations and the state court's adjudication of them on collateral review before accepting as reasonable the state court's determination that there had been no violation of Petitioner's right to effective assistance of counsel.

### C.  Petitioner's Objections

Petitioner's Objections to the Report are as follows:

1. Petitioner objects to the Magistrate Judge's determination that, notwithstanding deficient performance as to Claim 1, he is not entitled to relief as there was no prejudice sufficient to meet the standard in Strickland as there was not, contrary to the Magistrate's assertion, overwhelming evidence.  As to Claim 2, Petitioner renews the objection that there was not overwhelming evidence.  Regarding both, Petitioner objects to the Magistrate's inaccurate characterization of witness testimony that supposedly disproves the alibi defense.

2. Petitioner accepts the Magistrate Judge's determination that he was entitled to de novo review of his first claim, but objects to the Magistrate Judge's

determination that two of the three reasons proffered by petitioner in support of <u>de novo</u> review are not meritorious.[6]

3. Petitioner objects to the Magistrate Judge's determination that, as to his second claim, he is not entitled to <u>de novo</u> review.

4. Petitioner objects to the Magistrate Judge's determination that, as to his second claim, there was no Fifth Amendment violation and consequently no ineffective assistance of counsel.

5. Petitioner objects to the Magistrate Judge's determination that, as to his second claim, there was no Due Process violation and consequently no ineffective assistance of counsel.

6. Petitioner objects to the Magistrate Judge's recommendation that not only should relief be denied but that no certificate of appealability should issue.

(Doc. No. 28 at 2-3.)  The Court will address each Objection seriatim.

## 1. Petitioner's First Objection Is Unavailing Because the Evidence Considered in its Entirety Was Overwhelming

Petitioner first objects to the Magistrate Judge's finding that Petitioner was not prejudiced by his lawyer's errors because the evidence against him was overwhelming.  (<u>Id.</u> at 3.)  This Objection addresses several alleged claims of factual and legal errors by the Magistrate Judge, each of which will be discussed in turn.

### i. The Magistrate Judge Was Correct that the Overwhelming Evidence Could Not Give Rise to Prejudice Sufficient to Meet the <u>Strickland</u> Standard

Petitioner claims that the Magistrate Judge's analysis of the <u>Strickland</u> prejudice standard was excessively stringent.[7]  (<u>Id.</u> at 4.)  In support of this argument, Petitioner cites <u>Gov't of</u>

---

[6] Footnote 3 of the Objections states: "Petitioner does this, even though he did receive <u>de novo</u> review of his first claim, in case this Court disagrees with the one ground on which the Magistrate decided to apply <u>de novo</u> review."

[7] To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate the following: (1) counsel's representation was objectively unreasonable; and (2) but for counsel's

Virgin Islands v. Vanterpool, which states in relevant part: "A reasonable probability is a probability sufficient to undermine confidence in the outcome.  That requires a 'substantial,' not just 'conceivable,' likelihood of a different result.  This standard is not a stringent one."  767 F.3d 157, 165 (3d Cir. 2014) (internal citations omitted).  The Court agrees that Third Circuit law has defined the Strickland prejudice inquiry as not stringent.

According to Petitioner, the Magistrate Judge's analysis was too stringent with regard to two "critical factors": (1) the length of jury deliberations, and (2) the "proportion of the prosecutor's closing argument dedicated to attacking the alibi defense."[8]  (Doc. No. 28 at 4.)

As to the jury deliberations, Petitioner argues that "[t]he inverse relationship between the number of issues to be resolved and the length of deliberations shows that the evidence was not overwhelming."  (Id. at 5.)  Because the issue before the jury was simple, he argues, it taking seven hours to deliberate, as well as its request that a portion of testimony be reread,[9] should have been given greater weight in the Magistrate Judge's analysis.  The Magistrate Judge rejected Petitioner's argument, reasoning that the length of jury deliberations is not evidence and

---

deficient representation, there is a reasonable probability that the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 668 (1984) (emphasis added).

[8] While Petitioner also objects to the Magistrate Judge's determination that there was no Strickland violation as to Claim Two, he does not "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections[.]"  Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012).  Instead, the briefing on his first Objection centers on Claim One.  As such, the Court will not address this portion of this Objection and will agree with the Magistrate Judge that the evidence as to Claim Two, considered as a whole, does not reach the Strickland prejudice threshold.  The Magistrate Judge's analysis of Claim Two is reviewed in greater detail below.

[9] The jury's question related to allegations that Petitioner intentionally spilled coffee to suggest shock at Webb's death.

therefore does not affect the <u>Strickland</u> prejudice analysis.  He likewise rejected the case law
cited by Petitioner as neither binding nor holding that a failure to consider the length of jury
deliberations reflected an unreasonable application of <u>Strickland</u>.  Petitioner cites the same cases
in his Objections.[10]  The Court declines to speculate as to what occurred during the seven-hour
deliberation.[11]  Because the Court is satisfied with the Magistrate Judge's comprehensive
examination of the case law, it agrees with his conclusion that federal law does not require this
Court to consider the length of jury deliberations in analyzing <u>Strickland</u> prejudice.[12]

 Regarding the prosecutor's comments, Petitioner alleges that the prosecutor presented a
"detailed and prolonged challenge" to the alibi testimony in this case, and that his comments
shifted the burden to Petitioner to prove an alibi defense.[13]  The Magistrate Judge deemed the

---

[10] The cases cited by Petitioner are: <u>Thomas v. Chappell</u>, 678 F.3d 1086 (9th Cir. 2012); <u>Dugas v. Coplan</u>, 428 F.3d 317 (1st Cir. 2005); <u>Silva v. Woodford</u>, 279 F.3d 825 (9th Cir. 2002); <u>Mayfield v. Woodford</u>, 270 F.3d 915 (9th Cir. 2001); <u>Murtishaw v. Woodford</u>, 255 F.3d 926 (9th Cir. 2001); and <u>Washington v. Ollison</u>, No. C 06-4490 SI (PR), 2009 WL 3112088 (N.D. Cal. Sept. 23, 2009) <u>aff'd</u>, 414 F. App'x 959 (9th Cir. 2011).

[11] As Respondents note in their Response in Opposition, given the evidence and nature of the case, a lengthy jury deliberation could just as easily be attributable to trial counsel's effectiveness in presenting his case.  (Doc. No. 34 at 4.)

[12] Petitioner cites one case that was not mentioned in the Report.  In <u>Thomas v. Chappell</u>, the court considered the length of jury deliberations and the jury's request for a read-back in its <u>Strickland</u> analysis.  678 F.3d 1086, 1103 (9th Cir. 2012).  The jury deliberated for "almost five full days, even though it heard argument and evidence for only about six days," and the court noted that lengthy jury deliberations can suggest a difficult case.  Like the other cases cited in Petitioner's Objections and the Magistrate Judge's Report, <u>Thomas</u> is not binding on this Court.  Furthermore, in this case, the jury deliberated for about seven hours after hearing argument and evidence for five days.

[13] The prosecutor's closing argument included the following comments:

 "He cannot prove where he was for the period of time within which we say this
 murder occurred."

remarks to "generally fall within the realm of acceptable argument and oratorical flair." (Doc. No. 27 at 42.) He further concluded that the comments were not reasonably likely to shift the burden, especially since the jury was given a general instruction regarding the burden of proof.[14] Petitioner argues that this potential shift of burdens is particularly troubling because "[j]urors, not trained in the law, consider alibi a defense, a conundrum that is not 'fixed' by a general instruction."[15] (Doc. No. 28 at 7.) See United States v. Simon, 995 F.2d 1236, 1243 (3d. Cir. V.I. 1993) ("We require such a specific instruction regarding an alibi defense because the jury is likely to become confused about the burden of proof when an appellant offers this type of evidence."). The Court agrees with the Magistrate Judge that, considering all of the evidence, there is no "reasonable probability that the alibi instruction would have been the 'tipping point' for the jury to acquit" Petitioner. (Doc. No. 27 at 43.)

---

> "Does the Defendant have somebody who will say that they were with him between 10 and 11 o'clock? No. No, he doesn't have."
>
> "Not only can the Defendant not account for where he was from the time Felicia has left . . ."
>
> "Now, the Defendant wants you to believe that he gets to Mulligan's between 10:20 and 10:25."

(Doc. No. 11-38 at 34.)

[14] The trial court instructed the jury, in relevant part:

> It is not the Defendant's burden to prove that he's not guilty. It is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the Defendant is guilty of that crime beyond a reasonable doubt. As I've indicated earlier, the person accused of a crime is not required to present evidence or prove anything in his own defense.

(Doc. No. 11-35 at 22-23.)

[15] At oral argument on the Objections, counsel for Petitioner conceded that an alibi jury instruction is not so fundamental that error may be presumed from the failure to give it. (Doc. No. 39 at 16:8-25.)

The <u>Strickland</u> "reasonable probability" standard is not a stringent one, and the Magistrate Judge's analysis was not "excessively stringent."   Petitioner's arguments as to prejudice do not meet the <u>Strickland</u> standard.

> **ii.  Even if the Magistrate Judge's Characterization of Witness Testimony Disproving the Alibi Defense Was Not Precise, There Was No Prejudice.**

According to Petitioner, the "critical mis-characterization" of the evidence in the Report is the Magistrate Judge's finding that "[a] host of disinterested witnesses offered testimony that portrayed Sileo as having planned this crime as pressure at the Inn and tensions with Webb mounted."  (Doc. No. 27 at 41.)  Petitioner avers that this statement is inaccurate because there was no testimony regarding planning by Petitioner, and the evidence presented in the case was entirely circumstantial.  (Doc. No. 28 at 3.)  Petitioner further contends that "the record is not unequivocal and precise in refuting the alibi.  The prejudice analysis here cannot be the record in the light most favorable to the prosecution, but must instead acknowledge the facts that a reasonable jury could have found."  (<u>Id.</u> at 8-9.)

The Court recognizes that "a host of disinterested witnesses" did not testify to planning by Petitioner; however, there was testimony regarding planning.   For example, bartender Christopher S. testified that the month before the murder, Petitioner asked Christopher S., "Chris, do you know of countries that we don't have any extradition treaties with, like if you wanted to—where—somewhere you could hide-out if you wanted to kill somebody."  (Doc. No. 11-36 at 20:24-25; 21:2-3.)  In addition, the pastry chef of the General Wayne Inn testified that she heard Petitioner say on two occasions—two to three weeks prior to Mr. Webb's death—"I really feel like I need to shoot someone."  (Doc. No. 11-29 at 90:25; 91:2-7.)

Petitioner also objects to the Magistrate Judge's description of witness testimony regarding the timing of relevant events.  Specifically, Petitioner objects to the Magistrate Judge's statement that "<u>Michelle P. established</u> that Felicia M. drove away, leaving Appellant alone across the street from the Inn sometime between 9:45 p.m. and 10:00 p.m. Meanwhile, <u>Christopher S. proved</u> that Appellant did not arrive at Mulligan's Bar until after 10:30 p.m." (Doc. No. 27 at 37 (emphasis supplied).)  Petitioner refutes these statements, citing testimony of Michelle P. that she was not "exactly sure" what time Felicia M. arrived at her house and the testimony of Christopher S. that he was estimating Petitioner's time of arrival.  The statement in the Report to which Petitioner now objects was part of a lengthy quotation from the Superior Court opinion.  Therefore, Petitioner objects to the Magistrate Judge's acceptance of the Superior Court's characterization of that testimony.  The Court agrees with the Magistrate Judge that the evidence offered by these two witnesses, "even if credited generally, left time for [Petitioner] to have committed the murder."  <u>Id.</u> at 41.)

Thus, while the Magistrate Judge may have misstated the evidence by omitting reference to certain testimony, any such "mischaracterization" by the Magistrate Judge was not critical.  As noted by the Magistrate Judge, the witness testimony that Petitioner relies on still left time for Petitioner to have committed the murder.  The characterization of the evidence by the Magistrate Judge was not an overly stringent reading of the record and no prejudice to Defendant has been established.

### 2.  Petitioner's Second Objection Is Not Persuasive Because He Is Only Entitled to <u>De Novo</u> Review on the Alibi Claim Based on the State Court's Unreasonable Determination of the Facts

The Magistrate Judge reviewed the alibi claim using a <u>de novo</u> standard.  He did so because he found that the state court decision was based on an unreasonable determination of the

facts.[16]  Petitioner objects to the Magistrate Judge's finding that only one of the grounds upon which Petitioner sought <u>de novo</u> review of his first claim is meritorious.  (Doc. No. 28 at 9.)  He accepts the Magistrate Judge's conclusion that he is entitled to <u>de novo</u> review, but objects "in case this Court disagrees with the one ground on which the Magistrate decided to apply <u>de novo</u> review."  (<u>Id.</u> at 2.)  Because the Court is persuaded by the Magistrate Judge's determination that <u>de novo</u> review is warranted based on an unreasonable determination of the facts by the state court, it will not address whether the other two reasons for <u>de novo</u> review were meritorious.

The Magistrate Judge properly concluded that the state court mischaracterized ballistics evidence in the case, and this mischaracterization resulted in an unreasonable determination of the facts.  (Doc. No. 27 at 21.)  This unreasonable determination of the facts "provide[d] the backdrop against which the [Superior Court] considered the damage to Petitioner from the absence of an alibi instruction."  (<u>Id.</u> at 22.)  The key misstatement in the Superior Court's opinion was, "The Commonwealth established that Appellant's Phoenix Arms handgun was loaded with bullets from a box of bullets contained in a room next to the decedent's office and

---

[16] Pursuant to 28 U.S.C. § 2254(d), federal habeas relief is precluded on:

> any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Thus, the bar to habeas relief may be lifted, thereby warranting <u>de novo</u> review, in certain circumstances.  <u>De novo</u> review is warranted if a petitioner can show that state court proceedings: (1) resulted in a decision that was contrary to clearly established federal law; (2) involved an unreasonable application of clearly established federal law; or (3) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  In this case, Petitioner argued that all three avenues to <u>de novo</u> review applied.  (Doc. No. 28 at 2.)  The Magistrate Judge concluded that <u>de novo</u> review was warranted based on the third circumstance.

that a bullet from that box was used to murder Jim Webb."   Sileo, 32 A.3d at 766-67.   The Magistrate Judge agreed with Petitioner that this statement was not consistent with the testimony of the Commonwealth's expert witness.   (Id. at 23.)   Expert witness Charles Peters had testified that he "[could not] say" that the bullet that killed Webb came from the box in the room next to his office.   Instead, Peters testified that "it was 'highly probable' that the bullets came from the same source of lead, and that such bullets 'generally end up in the same boxes.'"   (Id. at 23 (quoting Doc. No. 11-37 at 24-25).)   Given this testimony, it cannot reasonably be said that the Commonwealth conclusively established that the bullet came from the box in the adjacent room.

The Magistrate Judge noted a second misstatement in the Superior Court's recitation of the evidence.   FBI Special Agent Paul Tangren testified at trial about bunters used in the production of bullets.   Bunters are tools that press headstamps on the base of the cartridge metal of bullets.   Each bunter is unique and allows for "differentiation among the otherwise apparently-identical headstamp of a sample of cartridges."   In its Opinion, the Superior Court described Tangren's testimony as follows: "All the cartridges that he examined had Winchester headstamps, and the identical bunter produced each one of those headstamps."   Sileo, 32 A.3d at 764.   As the Magistrate Judge observed:

> Tangren actually testified that he confirmed that the same bunter was used in the manufacture of: the fired cartridge found in the room at the Inn where Webb was discovered, *one* cartridge of the sample that he analyzed from the box of unfired cartridges in the next room at the Inn, and *one* cartridge from Sileo's gun.   He further testified, however, that of the 37 total cartridges he examined, including several more from Sileo's gun and the box at the Inn, a total of ten different bunters were used.   Given that a single bunter is used for approximately 125,000 cartridges, the evidence of ten bunters implicated the production of approximately 1.25 million shells.

(Doc. No. 27 at 24-25 (emphasis supplied).)  While a factual determination by a state court is presumed to be correct under 28 U.S.C. § 2254(e)(1),[17] a petitioner may rebut this presumption by clear and convincing evidence.  The Magistrate Judge concluded that Petitioner had carried this burden, thereby requiring de novo review of his claim that he was prejudiced by counsel's failure to request an alibi instruction.  The Court agrees with the Magistrate Judge that Petitioner successfully demonstrated that de novo review was warranted based on an unreasonable determination of the facts relating to ballistics evidence.

Likewise, the Court also agrees with the Magistrate Judge that, upon de novo review, it is clear that "the jury was presented with a substantial quantum of evidence of Petitioner's guilt from a variety of sources."  (Doc. No. 27 at 40.)  Therefore, despite the unreasonable determination of the facts by the state court, Petitioner was not prejudiced by the absence of an alibi instruction.

> ### 3.  Petitioner's Third Objection Is Without Merit—and Claim Two Is Not Entitled to De Novo Review—because the Superior Court Did Address the Substantive Use of Petitioner's Silence

In his third Objection, Petitioner objects to the Magistrate Judge's finding on Claim Two, which involved impermissible review of his pre-arrest silence, that he was not entitled to de novo

---

[17] 28 U.S.C. § 2254(e)(1) provides as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

review.[18]   (Doc. No. 28 at 11.)   In declining to grant <u>de novo</u> review, the Magistrate Judge explained:

> Sileo argues that he is entitled to *de novo* review by this Court as to this aspect of his claim on the grounds that the state court only appreciated part of his challenge. He argues that it looked only to whether the comments on pre-arrest silence were admissible for impeachment purposes without addressing whether his silence was used as substantive evidence of guilt.  We do not agree with Petitioner's proposition that the deficiency he perceives in the state court's analysis of part of his claim releases him from the constraints of § 2254(d) review particularly where his claim is one of ineffective assistance of counsel and not the more particular Fifth Amendment issue.  He also argues for *de novo* review on the grounds that the Superior Court's opinion notes that he *once* made a statement to police regarding whether he owned a second .25 caliber gun but failed to note that there were other occasions in which he did not volunteer information to investigators. He argues that this reflects an unreasonable determination of facts under § 2254(d)(2).  We do not, however, find the state court's determination of his ineffectiveness claim to be "based on" this fact as to enable Sileo to avoid the requirements of § 2254(d) review.

(<u>Id.</u> at 11-12 (quoting Doc. No. 27 at 52-53) (internal citations omitted).)

Petitioner objects to this finding, claiming that the state court addressed only impeachment and not substantive use of silence.  (Doc. No. 28 at 12.)  As such, the substantive use of silence has not been adjudicated and "although the Superior Court may have decided that counsel was not ineffective when he failed to preclude or object to impeachment use of evidence, that Court never addressed that the evidence was used *substantively* and whether counsel was ineffective in that regard."[19]   (<u>Id.</u> (emphasis added).)   According to Petitioner, this claim therefore fell outside the constraints of § 2254 and warrants <u>de novo</u> review.[20]

---

[18]  As noted above, Petitioner's second claim for habeas relief was based on trial counsel's failure to object both to suggestions by the prosecutor that Petitioner's silence was evidence of guilt and to the prosecutor's comment upon his assertion of innocence in another case. (Doc. No. 1 at 4.)

[19]  Counsel for Petitioner reiterated this contention during oral argument on the Objections, arguing that "that claim, properly presented to the state court, was never addressed even in passing."  (Doc. No. 39 at 36:20-22.)

Upon review of the state court record, this Court agrees with the Magistrate Judge that the state court considered Petitioner's argument regarding the substantive use of silence.[21] The Superior Court opinion denying Petitioner's initial appeal of the denial of PCRA relief states, in relevant part:

> Appellant, in his first substantive claim, argues that the trial court erred when it dismissed, without a hearing, his ineffectiveness claims based upon the failure of prior counsel to challenge the prosecutor's references to (1) his failure to inform investigators that he had possessed a second .25 caliber firearm, and (2) his assertion of innocence and the presentation of vigilant defenses to the charges of perjury and false swearing. Specifically, appellant contends that those references by the prosecutor impermissibly infringed upon his right to pre-arrest silence, and, therefore, that trial counsel was ineffective for failing to object to such references. . . .
>
> Appellant's initial claim is premised upon the Commonwealth's cross-examination of appellant regarding the disposition of the second handgun, as well as the following remarks made by the prosecutor's closing argument:
>
>> [COMMONWEALTH COUNSEL]: Remember I highlighted this a couple of times. If we had every .25 caliber pistol ever manufactured since the beginning of time . . . [we] would be able to tell you which one killed Jim [Webb].
>>
>> But, of course, we don't have it. The reason we don't have it is that the man there kept us from that information.

---

[20] 28 U.S.C. § 2254(d) precludes federal habeas relief on:

> <u>any claim that was adjudicated on the merits in State court proceedings</u> unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

[21] The Court also agrees with the Magistrate Judge that this claim is properly characterized as a Sixth Amendment ineffectiveness claim rather than a Fifth Amendment one. (Doc. No. 27 at 53.)

> [If] he [appellant] had told us [about selling a second .25 caliber
> pistol] back in '96 or '97 or '98, we could have sent detectives to
> every gun show that had been through southeast Pennsylvania in
> the last five years, looking for it . . .
>
> But he doesn't give us that chance.  Why not?
>
> Because he knows we'll be able to prove one of two things.  He
> knows we'll be able to prove that that is a lie, and that's not how he
> got rid of [the weapon], or he knows we'll be able to find it and
> prove it's the murder weapon.  That's why.  That's why.

> N.T., July 31, 2001 (afternoon session, pp. 54, 59-60) (emphasis supplied).

> Appellant specifically contends that the prosecutor impermissibly used his failure
> to cooperate with investigators as substantive evidence of guilt, and thus violated
> his right to silence.

Com. v. Sileo, No. 2767 EDA 2006 [Doc. No. 11-105], slip op. at 7-9 (Pa. Super. Ct. Mar. 25,

2008).  The Superior Court proceeded to disagree with Petitioner's argument that he had invoked

his pre-arrest right to remain silent regarding possession of the second handgun, instead finding

that he had "affirmatively denied having possessed such a weapon."  Id. at 9.  Thus, the Superior

Court found that he had not invoked his right to remain silent.  Accordingly, it stated, "we

discern no basis upon which to conclude that the trial court erred in permitting the prosecutor to

examine appellant regarding the disposition of the second .25 caliber handgun, or that the

prosecutor exceeded the proper scope of closing argument.  Therefore, we agree with the trial

court that this claim lacked merit."  Id. at 10.

　　　　As noted by the Magistrate Judge, because the state court adjudicated the substantive use

of silence claim on the merits, Petitioner would have to satisfy the requirements of 28 U.S.C. §

2254(d)(1) or (2) in order to obtain habeas relief.  Petitioner has not argued that the state court's

analysis either "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal Law, as determined by the Supreme Court of the

United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and the Court does not find that it did.  28 U.S.C. § 2254(d).  In sum, the Court agrees with the Magistrate Judge that this claim is without merit and should be denied.

### 4. Petitioner's Fourth Objection Is Unfounded Since the Magistrate Judge Correctly Found No Fifth Amendment Violation

Petitioner next objects to the Magistrate Judge's finding that, as to Claim Two—involving suggestions by the prosecutor that Petitioner's silence was evidence of guilt—there was no Fifth Amendment violation and therefore no ineffective assistance of counsel.[22]  (Doc. No. 28 at 12.) According to Petitioner, "after an arrest and conviction for perjury, [Petitioner] did not provide information to the police or prosecution.  His silence extended over the period of the appeals in the perjury case, up to and through his arrest for homicide," and "that silence was elicited and argued not merely as impeachment evidence but as substantive proof of guilt."  (Id.)

The comments identified by Petitioner as violating his Fifth Amendment right are cited in the brief accompanying his petition for a writ of habeas corpus.  Petitioner stated, "petitioner was

---

[22] The Magistrate Judge interpreted Petitioner's Fifth Amendment and due process arguments as claims of ineffective assistance of counsel:

> [In his petition, Petitioner] addressed a claim of ineffective assistance of counsel in failing to object to the prosecutor's references to his silence leading up to the charges being filed against him in the homicide case . . . [and] a claim for violation of his due process rights and the presumption of innocence when the prosecutor made reference to his not guilty plea and appeal of his conviction in the perjury case.  We consider these arguments in the context of a single claim of ineffective assistance of counsel, as they were raised together as such in both the original counseled petition and the counseled petition submitted on this district's standard form.

(Doc. No. 27 at 46, n. 30.)  This Court also considers Petitioner's Fifth Amendment and due process arguments as part of an ineffective assistance claim.

questioned repeatedly as to why, in the years after Webb's death and *through the entire period in which he was prosecuted for perjury and appealing from that conviction*, he did not disclose to police the whereabouts of the firearm.  In closing argument the prosecutor exhorted the jurors to consider the silence on the whereabouts of the gun as affirmative proof of guilt."  (Doc. No. 1 at 13 (emphasis supplied).)   In his petition, Petitioner cited to various portions of the trial transcripts where the prosecutor allegedly violated Petitioner's Fifth Amendment rights.   The Magistrate Judge carefully examined these passages in the Report.  (See Doc. No. 27 at 55-57.) In doing so, he noted that in two instances of improper questioning cited by Petitioner, there were objections by trial counsel, and the trial judge sustained those objections.

In rejecting Petitioner's Fifth Amendment argument, the Magistrate Judge described the unique context of this case:

> Here, Sileo chose to testify.  He provided an account that conflicted with what he had told police earlier, e.g., that he had never had another .25 caliber gun other than the Phoenix Arms model that had been ruled out as the murder weapon.  The prosecutor's questioning and closing sought to demonstrate how the investigation might have proceeded differently had police had a lead as to where and how that second gun was disposed of.  It also sought to demonstrate to the jury why it should not find Sileo credible generally because his story had changed over time. It was not a situation where Sileo had been silent until trial but rather one where he made a statement to police at one point and then offered a different story at trial.  We find a legitimate basis for the prosecutor to probe the timeline of Sileo's accounts in this regard.   There were, certainly, some areas in which the prosecutor's focus perhaps improperly veered towards the time periods in which Sileo could have sought to correct his initial statement to police regarding his ownership at one time of another .25 caliber gun, which may have implied to the jury that Sileo was under some obligation to do so.   Where the prosecutor overstepped on cross-examination and questioned Sileo about not coming forward to assist police, however, counsel objected, and the objection was sustained.

(Id. at 60-61.)

Petitioner objects to the Magistrate Judge's determination that the context of Petitioner's silence was less deserving of Fifth Amendment protection than silence during a non-custodial

police interview.  (Id.)  He cites to United States v. Albert in support of his Objection.  773 F.2d 386 (1st Cir. 1985).  In Albert, the court held that the fact that a codefendant had previously pled guilty to federal bank robbery charges and had made a statement to the court at his sentencing did not mean that the codefendant waived his Fifth Amendment right to refuse to testify on the defendant's behalf at trial.  Id. at 389.  A crucial difference between the facts of this case and the facts in Albert is that the codefendant in Albert affirmatively invoked his right not to incriminate himself when called upon to testify at the defendant's trial.  Here, as the Magistrate Judge noted, Petitioner did not affirmatively invoke his right but rather failed to correct a lie over a period of time.  (Doc. No. 27 at 63.)

A recent Supreme Court case sheds additional light on the issue of a potential Fifth Amendment violation.[23]  In Salinas v. Texas, the petitioner, without being Mirandized or placed in custody, was questioned by police about a double homicide.  133 S. Ct. 2174, 2178 (2013). He voluntarily gave his shotgun to police for ballistics testing and answered most of their questions, but he declined to answer questions about whether the gun would match the shells recovered at the murder scene.  Id.  "After a few moments of silence," the petitioner answered other questions posed by the police officer.  Id.  The petitioner was subsequently charged with murder, and at his trial the prosecutor argued that his lack of response to the officer's question created an inference of guilt.  The petitioner was convicted, and on appeal he argued that the prosecution's comments on his silence in their case-in-chief violated his Fifth Amendment right against self-incrimination.

---

[23] Though briefing in the state court cases and habeas petition had concluded prior to the decision—and therefore the briefs did not reference Salinas—counsel for the parties addressed the case at oral argument on the Objections.  (Doc. No. 39 at 69.)

A plurality of the Supreme Court held that, in cases where a witness who is not in custody chooses to stand mute instead of answering a potentially incriminating question, the Fifth Amendment normally does not apply.  Therefore, as the Magistrate Judge stated in the Report, "'standing mute' in response to a police investigation can be probative and is fair fodder when the suspect is tried."   See also United States v. MacInnes, 23 F. Supp. 3d 536, 553 (E.D. Pa. 2014) (where the prosecutor highlighted the defendant's silence as constituting evidence of guilt during closing argument, "[t]he prosecutor's comments violated no constitutional right . . . because during the recorded exchange, MacInnes had not been arrested; he was not in police custody; and the circumstances surrounding the conversation did not implicate MacInnes's Miranda or Fifth Amendment rights."); People v. Tom, 331 P.3d 303, 305 (2014), reh'g denied (Oct. 1, 2014) (applying Salinas by stating, "We likewise apply the general rule here and conclude that defendant, after his arrest but before he had received his *Miranda* warnings, needed to make a timely and unambiguous assertion of the privilege in order to benefit from it.").

At oral argument on the Objections, counsel for Petitioner contended that Salinas does not apply to Petitioner because "once he's a convicted person in the perjury case . . . the right is self-effectuating," and Salinas "doesn't apply to someone who has a self-activating right like that." (Doc. No. 39 at 69:12-21.)  Therefore, it did not matter that Petitioner had not invoked the right to remain silent.  (Id.)  However, "[it] has long been settled that the privilege [against self-incrimination] 'generally is not self-executing' and that a witness who desires its protection 'must claim it.'"   Salinas, 133 S. Ct. at 2178.  It cannot be said, then, that Petitioner's perjury conviction established a self-executing Fifth Amendment privilege.

In sum, this Court agrees with the Magistrate Judge that the prosecutor's comments did not amount to a Fifth Amendment violation and therefore there was no ineffective assistance of counsel.

### 5.   Petitioner's Fifth Objection Is Without Merit Since the Prosecutor's Comments Did Not Result in a Due Process Violation

Fifth, Petitioner objects to the Magistrate Judge's determination that, as to Claim Two— regarding the prosecutor's comment upon Petitioner's assertion of innocence in another case— there was no due process violation and no ineffective assistance of counsel.   Specifically, Petitioner objects to the Magistrate Judge's reasoning that "[t]he jury had been given a special instruction that the perjury conviction was not to be used by them to reduce the government's burden of proof on the murder charge before them."   (Doc. No. 27 at 66.)   According to Petitioner, the Magistrate Judge ignored the fact that this jury instruction "permitted the jury to use what the prosecutor argued – that petitioner contested guilt in the perjury trial and asserted his right to trial, *just as he did in the homicide* – to determine his guilt in the homicide."[24]   (Doc. No. 28 at 14 (emphasis supplied).)

---

[24] Petitioner here refers to the following exchange that occurred between the prosecutor and Petitioner on cross-examination:

> [COMMONWEALTH COUNSEL]: You fought us every step of the way [in the proceedings for perjury and false swearing], didn't you?

> [PETITIONER]: That's correct.

> [COMMONWEALTH COUNSEL]: And in your perjury case you pled not guilty.

> [PETITIONER]: Correct.

> [COMMONWEALTH COUNSEL]: Just like here.

> [PETITIONER]: Correct.

35

The Magistrate Judge determined that, because the state court had adjudicated Petitioner's due process claim on the merits—concluding that the "single comment" of the prosecutor did not "so distort the truth-determining process as to result in a fundamentally unfair trial"—Petitioner would have to satisfy the requirements of § 2254(d)(1) or (2) in order to obtain habeas relief. This Court agrees. Petitioner has not argued that the state court's analysis either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and the Court does not find that it did. 28 U.S.C. § 2254(d). In sum, the Court agrees with the Magistrate Judge that this claim is without merit and should be denied.

---

[COMMONWEALTH COUNSEL]: And you wanted this wiretap excluded as evidence you, did you not?

[PETITIONER]: That's correct.

[COMMONWEALTH COUNSEL]: Because we had violated your rights in intercepting the communication, right?

[PETITIONER]: That's true.

[COMMONWEALTH COUNSEL]: Nevertheless, the Court, here in another courtroom in this building, didn't agree with you and admitted the wiretap, and we proved you were guilty, right?

[PETITIONER]: That's correct.

<u>Com. v. Sileo</u>, No. 2767 EDA 2006 [Doc. No. 11-105], slip op. at 10-11 (Pa. Super. Ct. Mar. 25, 2008).

### 6. Petitioner's Final Objection Regarding the Certificate of Appealability is Not Persuasive

Finally, Petitioner objects to the Magistrate Judge's recommendation that no certificate of appealability should issue in this case. (Doc. No. 28 at 14.) Petitioner argues that he is entitled to a certificate of appealability because he has provided strong legal support for his arguments and because it cannot be said that no reasonable jurist would find his alibi argument unavailing. In support of this contention, Petitioner notes that two judges of the Pennsylvania Superior Court concluded that Petitioner was prejudiced by trial counsel's failure to request an alibi jury instruction.[25] (Doc. No. 28 at 14.) However, the Superior Court, after further review en banc, upheld the PCRA court's holding that Petitioner was not prejudiced by the failure of trial counsel to request an alibi instruction. Com. v. Sileo, 32 A.3d 753, 767-68 (Pa. Super. Ct. 2011).

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability should only issue where a petitioner makes a substantial showing of the denial of a constitutional right and that reasonable jurists would debate the correctness of the ruling on the petition. Slack v. McDaniel, 529 U.S. 473, 484 (2000). Considering the above analysis, the Court agrees with the Magistrate Judge's finding that reasonable jurists would not debate the Court's determination, and a certificate of appealability should not be granted.

---

[25] On appeal from the PCRA decision, two judges of a three-judge Superior Court panel concluded that Petitioner's testimony established the existence of an alibi and remanded the case for an evidentiary hearing "limited to the strategic basis underlying the decision of trial counsel not to request an alibi instruction, as well as post-trial counsel's decision not to raise that issue." Com. v. Sileo, No. 2767 EDA 2006 [Doc. No. 11-105], slip op. at 26 (Pa. Super. Ct. Mar. 25, 2008). On remand, the PCRA court conducted the requisite hearing, ultimately concluding that there was no prejudice and denying relief. (Doc. No. 27 at 5) (quoting Sileo, 32 A.3d at 757).)

**V.      CONCLUSION**

For the above reasons, the Court will approve and adopt the Magistrate Judge's Report and Recommendation, and will deny the revised Petition for a Writ of Habeas Corpus.   An appropriate Order follows.